# ORIGINAL

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
2061 Kalanianaole Ave.
Hilo, HI  96720
Telephone: 808/933-3600
Facsimile: 808/933-3601

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 29 2010

at ____ o'clock and ____ min. ____ M.
SUE BEITIA, CLERK

Attorney for Plaintiffs,
W. AUGUSTUZ ELLIOTT and
KYOKO ELLIOTT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| W. AUGUSTUZ ELLIOTT and KYOKO ELLIOTT, as individuals<br><br>          Plaintiffs,<br><br>     vs.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY, A NATIONAL BANKING ASSOCIATION AS TRUSTEE OF THE INDYMAC INDX MORTGAGE TRUST 2007-FLX6, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-FLX6 UNDER THE POOLING AND SERVICING AGREEMENT DATED JULY 1, 2007; ONEWEST BANK, FSB, a Federal Savings Bank formerly INDYMAC BANK, FSB, a Federal Savings Bank; and DOES 1-100, inclusive<br><br>          Defendants. | Civil No. **CV10  00357BMK**<br><br>**COMPLAINT FOR DECLARATORY RELIEF, RECISSION AND MONETARY DAMAGES; VERIFICATION; SUMMONS** |

1

## INTRODUCTION

COMES NOW the Plaintiffs, W. AUGUSTUZ ELLIOTT and KYOKO ELLIOTT (hereinafter referred to as "Plaintiffs" or "Borrower"), by and through their attorney Paul J. Sulla, Jr., for this Complaint against Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY, A NATIONAL BANKING ASSOCIATION, AS TRUSTEE OF THE INDYMAC INDX MORTGAGE TRUST 2007-FLX6, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-FLX6 UNDER THE POOLING AND SERVICING AGREEMENT DATED JULY 1, 2007 and Defendant ONEWEST BANK, FSB, a Federal Savings Bank, formerly known as INDYMAC BANK, FSB, and allege and aver as follows:

## PARTIES

1.   At all times relevant herein, Plaintiffs, of majority age were and are residents of Honokaa, County of Hawaii, and State of Hawaii.

2.   The real estate located at 44-3220 Kalaiai Road, Honokaa, HI 96727 (hereinafter referred to as "Subject Property") is the subject of this litigation and the residence of the Plaintiffs.

3.   Plaintiffs purportedly entered into a loan repayment and security agreement on or about, July 5, 2007, with INDYMAC BANK FSB, a former Federal Savings Bank formerly of 115 North Lake Avenue, Pasadena, California (hereinafter referred to as "INDYMAC"), which required Plaintiffs to repay a loan of $624,000.00 ("Note") to INDYMAC and secured by a mortgages recorded on December 22, 2006, in the Bureau of Conveyances in the State of Hawaii, documents no. 2006-235282 ("Mortgage").

4. The Defendant ONEWEST BANK, FSB, a Federal Saving Bank, of 888 East Walnut Street, Pasadena, California (hereinafter referred to as "ONEWEST") has since acquired INDYMAC.

5.   The Defendant DEUTSCHE BANK NATIONAL TRUST COMPANY, A NATIONAL BANKING ASSOCIATION AS TRUSTEE OF THE INDYMAC INDX MORTGAGE TRUST 2007-FLX6, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-FLX6 UNDER THE POOLING AND SERVICING AGREEMENT DATED JULY 1, 2007 (hereinafter referred to as "DBC Trustee") c/o ONEWEST BANK, FSB, a Federal Saving Bank of 888 East Walnut Street, Pasadena, California is and was, at all material times hereto, a foreign corporation whose corporate domicile and alleged authority to do business in the State of Hawai'i is unknown. Defendant DBC is a corporate entity functioning as an alleged trustee for a certain pooling and servicing agreement relating to certain mortgage pass thru certificates issued by another corporation (being a certain INDYMAC BANK, domicile and authority to do business in Hawai'i also being unknown) which, on information and belief, issued securities which may or may not have been properly registered and in the form of either collateralized mortgage obligations (CMOs) or collateralized debt obligations (CDOs) or other form of exotic investment vehicle which may or may not be collateralized in whole or in part by the mortgage the subject of this action, and where the Certificate holders of the subject securities may or may not have an interest, in whole or in part, in the mortgage and or the Note the subject of this action.

6. Plaintiffs are informed, believe and therefore allege that Defendant DBC Trustee alleges to be the current holder of the Note with ONEWEST as the implied servicer of the Note and mortgage. DBC Trustee impliedly alleges that INDYMAC and/or ONEWEST assigned, transferred and/or sold its right in the Note to DBC Trustee, giving it the power of sale to foreclose on the mortgage. No such assignment however appears on the record title.

7.  Plaintiffs are informed, believe and therefore allege
that MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware
Corporation, having a business address of P.O. Box 2026 Flint,
MI 48501-2026 (hereinafter referred to as "MERS"), is named to
act as nominee for Lender INDYMAC and/or ONEWEST under the
mortgage instrument. MERS is not mentioned in the mortgage note.

8.  MERS is simply an "artificial" entity designed to
circumvent certain laws and other legal requirements dealing
with mortgage loans. By designating certain MERS member
employees to be MERS corporate officers, MERS has created a
situation whereby the foreclosing agency and MERS' "designated
officer" have a conflict of interest.

9.  The Defendants (each of them named in paragraphs 4
through 5 above, shall collectively be referred to as
"DEFENDANTS") named herein "all persons unknown", claiming any
legal or equitable right, title, estate, lien or interest in the
property described in this Complaint adverse to Plaintiffs'
title thereto and as DOES I through 100 (hereinafter referred to
as "UNKNOWN DEFENDANTS") are unknown to Plaintiffs. These
unknown Defendants and each of them, claim some right, title,
estate, lien or interest in the Subject Property hereinafter
described adverse to Plaintiffs' title and their claims and each
of them constitute a cloud on Plaintiffs' title to the Subject
Property.  Plaintiffs are informed and therefore believe, and on
that basis allege, that each defendant fictitiously named herein
as a DOE is responsible for the events happening hereinafter
alleged.  Plaintiffs will seek leave of the Court to amend this
Complaint to allege the true names and capacities of said
fictitiously named DOE Defendants when ascertained.

10.  Plaintiffs are informed, believe and therefore allege
that at all times mentioned herein, the UNKNOWN DEFENDANTS were
individuals and/or business entities, whose forms are unknown

and were agents, principals, employees, employers and co-conspirators of each and every other named or unnamed Defendant in this Complaint. Plaintiffs are informed, believe and therefore allege that each of said Defendants is and at all relevant times herein, was acting within the scope and consent of the remaining named and unnamed Defendants.

11. As a result of their mortgage activities, Defendants and each of them, are and were subject to and must comply with the Federal Truth In Lending Act (hereinafter referred to as "TILA") [15 U.S.C. §1601-16666j]; [24 C.F.R § 3500.1-3500.17]; the Real Estate Settlement Procedures Act (hereinafter referred to as "RESPA") [12 U.S.C. § 2601 et.seq.]; Federal Trade Commission § 5]; 24 Code of Federal Regulations § 3500.10; § 10241.3; Unfair and Deceptive Business Practices and Acts [UDAP Statutes]; and the Code of Federal Regulations § 226.23(3), Hawaii Revised Statutes sec. 480-2, among others.

## JURISDICTION

12. Jurisdiction arises under 15 USC 1601 et seq., 15 USC 1635, 15 USC 1640, Title 12, and Regulation Z, Part 226 et seq., Title 24 CFR, Regulation X, part 3500, plus the diversity of the parties.

## FACTUAL ALLEGATIONS

### a. Mortgage Loan is unfair, deceptive and breaches INDYMAC/ONEWEST'S fiduciary duty to Plaintiffs

13. On or about July 5, 2007 (hereinafter referred to as "Origination Date"), Plaintiffs allegedly entered into a consumer credit transaction with INDYMAC by obtaining a $624,000.00 mortgage loan note, secured by Plaintiffs' principal residence (Subject Property). This note was allegedly secured by a Mortgage on the Subject Property in favor of INDYMAC.

14. The loan program on the loan to the Plaintiffs consisted of FLEX pay ARM for 30 years with a 6.25% fixed interest rate for the first 5 years with three (3) payment options: (a) minimum (with negative amortization); (b) interest only; or (c) fully amortized loan. The loan had a very high margin of 2.75% and a three (3) year prepayment penalty. Following the first five (5) years, the rate adjusts annually based upon the 12 month LIBOR Index starting initially at a rate not to exceed 11.25% or less than 2.75%. There is a 115% deferred interest cap. This means that though the loan amount was for 624,000.00, the negative interest would result in a maximum principal balance of $717,600.00; a difference of over $90,000.00 more than was expected by Plaintiff. Other features of the program call for the payment to be flexible for next five (5) years (years 6-10). Until maximum balance of $717,600.00 is reached, the minimum payment of 50% of the fully amortized rate remains an option for those next 5 years.

15. The minimum "teaser" payment of $1,921.04 based upon 50% of the initial fully amortizing rate is disclosed on the note itself and the preliminary TIL statement; the fully indexed rate of 8.125% for the next five years is shown as $4,856.85 and the fully amortized rate after 10 years is reached is shown as $6,055.87. During the processing of this loan, INDYMAC was aware that "payment shock" would occur because the loan had the potential and the requirement for a significant adjustment to the minimum payment of $1,921.04, to a monthly payment of $4,856.85 - $6,055.87 as principal and interest, causing the payment to balloon to an amount that was unaffordable by Plaintiffs. As a result, the Plaintiffs became concerned to avoid the approaching "payment shock" and were required to investigate the actions of the Defendants.

16. The terms of the finance transaction with INDYMAC were

6

not clear or conspicuous, nor consistent, and are illegal. The loan was 100% of the value. The property was valued at $780,000. The tentative HUD1 settlement statement (no final HUD1 was provided the Borrower) lists the Borrower credits for the new $624,000 loan, $39,000 for a 2nd loan, credit of $1,401.66 and interest refund of $108.33 for a total of $664,509.99. Borrower was debited with the existing $537,803.48 mortgage to Countrywide and $63,819.84 closing costs. In fact $38,900 of the $63,819.84 was paid to the lender and returned to the Borrower in the form of a 2nd mortgage credit line. With this 2nd mortgage the debt secured by the property is $663,000. The 1st mortgage was approved on a Loan to Value ratio of 80% but by churning the cash back into a 2nd mortgage, the Loan to Value ratio dropped to 85% - exceeding normal underwriting standard of 80%.

17. The Plaintiffs therefore had little value in the home. The Plaintiffs would not be able to refinance out of the high rate, or consolidate the loans into one loan, due to lack of equity. Plaintiffs were given a loan that was not appropriate for them. The loan was more expensive in terms of fees, charges and or interest rates than alternative financing for which Plaintiffs could have qualified or already had. The terms are such that the Plaintiffs can never realistically repay the loan.

18. The Defendant INDYMAC allowed its broker to charge an excessive fee of 3% bringing the closing costs of $24,919.84 with broker's fees of $20,000 for $18,750 fees and administrative fee and processing fee of $1250. In addition INDYMAC added $1505 for its funding and fees bringing the closing costs/fees to the excessive amount of $21,505.00 closing costs that may qualify for treble damages pursuant to 12 U.S.C. sec 2607.

19. The loan product sold to Plaintiffs in this case was exactly the kind of loan that has contributed to our national

7

problem. The Defendant INDYMAC was aware of this trend, and possessed the foresight to advise Plaintiffs but failed to do so while the Plaintiffs relied upon the representations of INDYMAC. INDYMAC intentionally concealed the negative implications of the loan they were offering, and as a result, the Plaintiffs face the potential of losing their home to the very entity and entities that placed them in this position.

20. For years, mortgage brokers and lenders such as INDYMAC have been selling loan products that they knew, or should have known, would never be able to be repaid by borrowers like the Plaintiffs and would prevent such borrowers from ever actually owning the home. The Plaintiffs' 700+ FICO scores made them candidates for prime mortgage programs. The Defendant INDYMAC owed a fiduciary duty to the Plaintiffs yet instead, the Plaintiffs were offered a product that amounted to no more than a short term lease until the payments became so unaffordable that they now face either bankruptcy or foreclosure or both.

21. Further, INDYMAC relied on stated income, assets and liabilities. Lenders cannot make a reasonable determination of whether Plaintiffs could qualify for the 100% home loan without further verification and scrutiny placed upon the underwriting process. There was no determination of the ability of the borrowers to repay the loan, with complete disregard for the Guidance Letters issued by Federal Agencies and even Federal and State Law. The underwriter approved this loan based upon a medium to high risk credit score and a belief that the property would continue to increase in value. The Plaintiffs clearly should have been declined for this loan.

22. INDYMAC failed to properly verify whether Plaintiffs had enough income, reserves and a credit history that supported the loan program offered. Plaintiffs simply stated their income, while INDYMAC constructed the loan program based upon that

statement and a credit check only. The failure of INDYMAC to properly underwrite this loan violated their fiduciary duty and placed Plaintiffs into a predatory loan.

23. These acts of unfairness and deception violate several statutes and in essence create an illegal loan. Had INDYMAC used a more accurate and appropriate factor, such as Tax Forms and a more determinative level of scrutiny, of determining the debt to income ratio, Plaintiffs would not have qualified for the loan in the first place. INDYMAC did not perform with due diligence by failing to confirm the Borrower's ability to make payments over the lifetime of the loan.

24. Consequently, INDYMAC breached their fiduciary duty to the Plaintiffs. They sold a loan product that they knew or should have known would never be able to be fully paid to INDYMAC by Plaintiffs. INDYMAC ignored long-standing economic principals of underwriting and instead, knowingly, liberally, greedily and without any regard for Plaintiffs' rights or their fiduciary duty to the Plaintiffs - sold Plaintiffs a deceptive loan product.

25. Each subsequent Defendant who has participated in, been assigned or been transferred rights, or holds a position or interest under this loan agreement, including ONEWEST, DBC TRUSTEE and UNKNOWN DEFENDANTS (hereinafter referred to collectively as "Defendants") failed to perform their due diligence in investigating the legal requirements that this loan should have been processed within. As a result, Defendants now hold an interest in a loan that was improperly handled from its inception.

26. The allegations and consequential liability that is held by the Defendants INDYMAC and UNKNOWN DEFENDANTS, and each of them, for their role in the fraudulent and deceptive loan

program provided to the Plaintiffs, will continue to exist to
Defendant ONEWEST and DBC TRUSTEE as successors in interest.
Likewise ONEWEST and DBC TRUSTEE were under a fiduciary duty to
inspect and examine the practices of the originators of the
loan. Any original violations, breaches and/or illegality will
flow to ONEWEST and DBC TRUSTEE as well.

27. As a result of the negligence and numerous omissions,
violations, and breaches of duties committed by the Defendants
in the marketing, assigning, securitizing and servicing of the
loan as described, in part, above, the Plaintiffs seek the
rescission of the Loan Documents, statutory and actual damages,
as well as the Plaintiffs' reasonable attorney's fees and costs.

**b. Both ONEWEST and DBC TRUSTEE Lack Legal Standing to Foreclose**

28. Where a power to sell real property is given to a
mortgagee, or other entity whom has placed an encumbrance on
title, in an instrument intended to secure the payment of money,
the power of sale is part of the security and vests in any
person who by assignment becomes entitled to payment of the
money secured by the instrument. The power of sale may be
exercised by the assignee if the assignment is duly acknowledged
and recorded.

29. MERS allegedly assigned the loan to DBC TRUSTEE as
nominee on behalf of INDYMAC/ONEWEST. MERS was created to
eliminate the need for the executing and recording of assignment
of mortgages, with the idea that MERS would be the mortgagee of
record. This would allow MERS to foreclose on the property, and
at the same time, assist INDYMAC/ONEWEST in avoiding the
recording of the Assignments of the loans sold. This saved
INDYMAC/ONEWEST money in manpower and the costs of recording
these notes. MERS was also designed to "shield" investors from

liability as a result of lender misconduct regarding the process of mortgage lending. This objective is an important requirement for the later securitization by investment bankers of the note, in many cases.

30. Since MERS does not have an interest in the note, nor do they receive the income from the payments, and since it is actually an employee of MERS signing the Assignment in the name of MERS, the Assignment executed by the MERS employee is of no effect and illegal. The actual owner of the note has not executed the Assignment to the new party. An assignment of a mortgage in the absences of the assignment and physical delivery of the note will result in a nullity.

31. It must also be noted that the lender or other holder of the note registers the loan on MERS. Thereafter, all sales or assignments of the mortgage loan are accomplished electronically under the MERS system. MERS never acquires actual physical possession of the mortgage note, nor do they acquire any beneficial interest in the Note.

32. The existence of MERS indicated numerous violations of the Unfair and Deceptive Acts and Practices due to the conflicting nature and identity of MERS in this process. Each of these practices was intentionally designed to mislead the borrower and benefit the lenders.

33. MERS has no right to assign a power of sale to foreclose upon the subject property to a successor; and therefore DBC TRUSTEE has no legal standing to foreclose the subject note and mortgage against the Plaintiffs.

### c. Plaintiffs' loan was pooled and securitized therefore INDYMAC/ONEWEST and/or DBC TRUSTEE do not hold the note, cannot represent the holders, and cannot enforce the mortgage

34. Upon information and belief, the Plaintiffs allege that DBC TRUSTEE and INDYMAC/ONEWEST do not own the Note but are only Trustee and Servicer for the mortgage pool holding the Plaintiffs' mortgage under a security offering registered and on file with the Securities and Exchange Commission (the "SEC").

35. Because the Mortgage was securitized, the Mortgage was rendered unenforceable because:

      (a)  Securitization of the Mortgage created restrictions upon modification of the Mortgage which had not been approved by the mortgagor.

      (b)  Without amending the terms and conditions of the Mortgage, securitization converted the Mortgage Note from an alienable, transferable instrument which was and could be sold into a instrument which cannot be sold, transferred or alienated,.

      (c)  Defendant does not own or hold the Note and cannot have the power and authority to represent the actual owners of the Note, as a matter of law.

      (d)  The subsequent holder of the Note which organized the securitization modified the Mortgage without the consent of the mortgagor and without consideration.

36. Securitization of a Mortgage makes the note holder disappear. The securitization leaves no party with standing to enforce the note. No party to the securitization is vested with a legal or equitable interest in the note so that no party to the securitization can enforce the note. The following actions deconstruct the holder of the note:

(a) Segmentation of cash flows into tranches;

(b) the avoidance of double taxation through REMIC;

(c) the disconnection of moral hazard (financial loss) from control and management of the note

(d) the insertion of service providing, fee collecting third party managers between the debtor and the creditor and creditor's successors in interest; and

(e) the subordination of the terms and conditions of the note and mortgage to the provisions of the master pooling and servicing agreement converting the bilateral structure of the note into a multilateral contractual arrangement.

37. Under the terms of the note, prescribed payments are due to the note holder. The note holder is either the original mortgagee or a successor in interest. Defendant ONEWEST and DBC TRUSTEE are neither.

38.  The securitization separates the Mortgage from the Note. Such a separation makes it impossible for the holder of the Note to foreclose, unless the holder of the Mortgage is the agent of the holder of the Note. Defendant does not own or hold the Note and has not claimed or demonstrated Defendant represents the actual owner of the Note.

## FIRST CAUSE OF ACTION

### Injunctive Relief – Lack of Standing

### (Against Defendant ONEWEST and DBC TRUSTEE)

39.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

40. This is an action for emergency temporary and permanent injunctive relief seeking to restrain ONEWEST and/or DBC TRUSTEE

from seeking a non-judicial sale upon the Subject Property
during the pendency of this action.

41. Plaintiffs have a clear legal right to seek temporary
and permanent injunctive relief, as Plaintiffs reside in the
Property. Unless restrained, the Defendants ONEWEST, DBC TRUSTEE
and/or the presently unnamed DOE Defendants may convey the
Property or cause the Property to be sold. Such a sale would be
to Plaintiffs' great and irreparable injury, for which pecuniary
compensation would not afford adequate relief. The result would
be to ultimately remove the Plaintiffs from their home without
satisfying the necessary legal standing requirements.

42. A Mortgage may only be enforced by a person legally
entitled to foreclose on the debt or such parties'
representative, such as a nominee or trustee. Transferring
ownership and holding of the Note to a fictitious, non-existent
owner and holder through securitization renders the Mortgage
unenforceable. A Mortgage cannot be foreclosed on behalf of the
putative owner and holder of a Note who does not actually own or
hold the Note. Defendant is not the real party in interest and
is not shown to be authorized to bring this action.

43. Standing requires that the party prosecuting the action
have sufficient stake in the outcome and that the party bringing
the claim be recognized in the law as being a real party in
interest entitled to bring the claim. As a result, although
Defendant names itself in the complaint as the owner of the
promissory Note and Mortgage, the copies of Mortgage and Note
attached to the complaint conflict with this allegation. ONEWEST
as the servicing agent and DBC TRUSTEE as the Trustee have no
legal or equitable interest in the securitized Mortgages.

44. Plaintiffs have no adequate remedy at law to redress
the harm complained of, and the sale of the Plaintiffs'
property, under the circumstances of record, is contrary to

equity and good conscience, in that such sale has been instituted by parties who have no legal standing to institute or maintain the foreclosure ab initio.

45. Plaintiffs have no other plain, speedy or adequate remedy, and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiffs. Plaintiffs have suffered and will continue to suffer in the future, unless Defendants' wrongful conduct is restrained and enjoined, because real property is inherently unique and it is and will be impossible for Plaintiffs to determine the precise amount of damage Plaintiffs will suffer.

46. As Defendant ONEWEST and/or DBC TRUSTEE have no legal standing to institute or maintain a foreclosure of the Property, there is no harm to said Defendants with the granting of the requested relief, and any claimed harm is substantially outweighed by the irreparable harm to the Plaintiffs if the relief requested herein is not granted.

47. The granting of the relief requested herein is in the public interest, as the public, including Plaintiffs, will continue to be harmed by the misleading and unlawful conduct of the Defendants unless the relief requested is not granted.

48. Under the circumstances here there is no harm to Defendants ONEWEST and DBC TRUSTEE with the granting of the requested relief, no bond should be required as a prerequisite to the granting of the relief requested herein, as there are no costs or other damages which could be contemplated with the granting of the requested relief for which a bond would otherwise be necessary.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CAUSE OF ACTION**

**Declaratory Relief**

**(Against Defendant ONEWEST and DBC TRUSTEE)**

49.  Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

50.  An actual controversy has arisen and now exists between Plaintiffs and Defendants ONEWEST and DBC TRUSTEE regarding their respective rights and duties. This is an action for declaratory relief, which is being brought pursuant to applicable law to declare that Defendants ONEWEST and DBC TRUSTEE, as a result of the unlawful and defective MERS assignment of Mortgage and Note and also the securitization of the loan, have no legal or equitable rights in the Note or Mortgage for purposes of foreclosure, and that said Defendants ONEWEST and DBC TRUSTEE as a result have no legal standing to institute or maintain foreclosure on the Property. A judicial declaration is necessary and appropriate at this time under all the circumstances so that Plaintiffs may determine their rights and duties under the Note and Mortgage.

51.  Plaintiffs have no adequate or alternative remedy at law with reference to the relief requested herein.

52.  As set forth above, Defendants ONEWEST and DBC TRUSTEE do not possess the requisite legal rights to foreclose on the Property.

53.  As set forth above, Defendants ONEWEST and DBC TRUSTEE have provided no evidence that it has full legal interest in and title to the Mortgage, and has provided no evidence that it has any interest in the Note.

54.  The declaration by this Court that Defendants ONEWEST and DBC TRUSTEE have no legal right and cannot satisfy the legal standing requirements to institute and maintain a foreclosure is proper subject matter for declaratory relief.

55. As set forth above, Defendants ONEWEST and DBC TRUSTEE, as the alleged foreclosing party(s), have failed to demonstrate any valid assignment of either the Mortgage or the Note, and are thus legally precluded from instituting or maintaining a foreclosure.

56. As set forth above, Defendant ONEWEST is only the servicer of the Note, and Defendant DBC TRUSTEE the Trustee, and as such, neither can institute nor maintain a foreclosure action either directly or indirectly as agent of Defendant ONEWEST or the securitized mortgage pool.

57. As a result of the Defendants' actions, Plaintiffs have suffered damages according to proof, and seek declaratory relief that Defendants' purported power of sale is void and has no force or effect against the Subject Property.

58. Further, Defendants' actions have been willful, knowing and malicious.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION

#### Contractual Breach of Implied Covenant of Good Faith and Fair Dealing

#### (Against All Defendants)

59. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

60. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its

17

purpose. This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

61. The terms of the Loan imposed upon Defendants a duty of good faith and fair dealing in this matter.

62. Defendants enjoyed substantial discretionary power affecting the rights of Plaintiffs during the events alleged in this Complaint. Defendants were required to exercise such power in good faith.

63. Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiffs when Defendants:

    a.   Willfully withheld numerous disclosures;

    b.   Willfully withheld notices in regard to excessive fees and finance charges including, Underwriting standards, Yield Spread Premiums, Good Faith Estimates, Disclosures of additional income due to interest rate increases, and failure to disclose when negative credit scores were disseminated;

    c.   Willfully placed Plaintiffs in a loan that they did not qualify for, could not afford, and subjected them to further financial detriment, while providing Defendants with financial benefits they would not have otherwise enjoyed.

64. As a result of Defendants' breach of this covenant, Plaintiffs have suffered injury and have caused Plaintiffs the threat of loss of their home. Plaintiffs have incurred and will continue to incur legal fees, including attorney fees and costs, as well as expenses to right this wrong.

65. Defendants' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiffs to punitive damages in an amount appropriate to

punish Defendants and to deter others from engaging in the same behavior.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Violation of TILA, 15 U.S.C. § 1601, et.seq.

### (Against All Defendants)

66.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

67.   The Truth In Lending Act (TILA) applies because the transaction involves the extension of credit to a consumer for personal, family or household purposes that is subject to a finance charge and/or payable by written agreement in more than four installments per 15 U.S.C. §§ 1601-1666j.

68.   Defendants violated TILA by failing the annual percentage rate (APR) test and the finance charge test to provide Plaintiffs with accurate material disclosures required under TILA, including but not limited to Right of Rescission form and Final Truth in Lending Disclosure form and not taking into account the intent of the State Legislature in approving this statute which was to fully inform home buyers of the pros and cons of adjustable rate mortgages in a language (both written and spoken) that they can understand and comprehend; and advise her to compare similar loan products with other lenders. It also requires the lender to offer other loan products that might be more advantageous for the borrower under the same qualifying matrix. Defendants were paid high fees, while neglecting underwriting standards and failing to disclose or explain the significance of the loan documents and the loan program.   This is a clear violation of the public policy of TILA, which is to more closely "even the playing field" and provide a check and balance to the lending industry.

69. Any and all statute[s] of limitations relating to disclosures and notices required pursuant to 15 U.S.C. § 1601, et. seq. were tolled due to Defendants' failure to effectively provide the required disclosures and notices.

70. An actual controversy now exists between Plaintiffs, who contends she has the right to rescind the loan on the Subject Property alleged in this Complaint, and based on information and belief, Defendants deny that right.

71. As a direct and proximate result of Defendants' violations, Plaintiffs have incurred and continue to incur damages in an amount according to proof but not yet ascertained, including without limitation, statutory damages and all amounts paid or to be paid in connection with the transaction.

72. Defendants were unjustly enriched at the expense of Plaintiffs, who is therefore entitled to equitable restitution and disgorgement of profits obtained by Defendants.

73. Defendants' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FIFTH CAUSE OF ACTION

### Violation of Real Estate Settlement and Procedures Act (RESPA)

### (Against All Defendants)

74. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

75. RESPA applies because a lender that regularly extends federally related mortgage loans aggregating more than $1 million per year, and intended for the purchase of a one-to-

four-family residential property are subject to RESPA per 12 U.S.C. §§ 2601-2617.

76. Housing and Urban Development's (HUD's) 1999 Statement of Policy established a two-part test for determining the legality of lender payments to mortgage brokers. In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to the goods, facilities, or services furnished or performed to determine whether it is legal under RESPA.

77. Defendants failed to disclose all affiliated business arrangements, including an Agency relationship between ONEWEST as required by RESPA and 24 C.F.R. § 3500.15.

78. Defendants failed to provide an accurate HUD-1 at closing (or 1 day before if requested) as required by RESPA and 24 C.F.R. § 3500.8(b).

79. Defendants violated RESPA because the payments to the mortgage broker and to the lender were misleading and designed to create a financial windfall to themselves, most notably charging the a Yield Spread Premium. These actions were deceptive, fraudulent and self serving.

80. As a proximate result of Defendants' actions, Plaintiffs have been damaged in an amount not yet ascertained, to be proven at trial.

81. Actual damages, statutory (up to $1,000 due to Defendants' prior patterns and practices), and treble damages for excessive portion of fees, plus attorney's fees and costs for violations noted are recoverable and requested by Plaintiffs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SIXTH CAUSE OF ACTION

### Rescission

### (Against All Defendants)

82.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

83. Plaintiffs are entitled to rescind the loan for all of the foregoing reasons: 1)   TILA Violations; 2) RESPA; 3) Fraudulent Concealment; and 4) Public Policy Grounds, each of which provides independent grounds for relief.

84. The Truth In Lending Act, 15 U.S.C §1601, et. seq., extends Plaintiffs' right to rescind a loan if the borrower received false or incomplete disclosures of either the loans terms or Borrower's right to rescind. Here, Defendants have failed to properly disclose the details of the loan. Specifically, flawed underwriting standards, knowledge that Plaintiffs was unqualified for the loan program, the initial disclosures do not initial TIL disclosures, and lack of diligence and collusion on the part of the broker, lender and underwriter to place Plaintiffs in a loan he could not afford and would ultimately benefit Defendants following the negative amortization that accrued.

85. The public interest would be prejudiced by permitting the alleged contract to stand; such action would regard an unscrupulous lender.

86. As a proximate result of Defendants' actions, Plaintiffs has been damaged in an amount not yet ascertained, to be proven at trial.

WHEREFORE, Plaintiffs pray for rescission of the stated loan in its entirety.

### SEVENTH CAUSE OF ACTION

**Fraud**

**(Against All Defendants)**

87. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

88. Defendants intentionally, willfully and wantonly engaged in the acts with the purpose of deceiving Plaintiffs and inducing them to part with their personal and real property by using a stated income loan.

89. The credit application and or available W-2's provided by Plaintiffs were enough, in addition to the application itself, for Defendants to know what type of loan should be offered, and what the Plaintiffs could not afford. Any falsification of a credit application by a broker or seller for the purposes of securing a loan is de facto fraud. In this matter, the mortgage broker had the Plaintiffs' increase the purchase price of the property in order for the Plaintiffs to be loaned back the closing costs for the 100% financing obtained.

90. Defendants engaged in the unlawful suppression of facts or circumstances by one of the parties to a contract from the other, for self-serving purposes and financial gain, which in justice ought to be made known.

91. This loan was fraudulent because Defendants:

    a) knowingly approved Plaintiffs based solely on stated income;

    b) knowingly approved and encouraged the Plaintiffs to increase the purchase price of the property to cover the closing costs of the loan in the loan amount; and

    b) underwriting Plaintiffs based on an interest only payment is "knowingly" selling a mortgage loan that will fail.

92. Plaintiffs relied on Defendants, while the Defendants' deception was the actual and proximate cause of Plaintiffs' damages.

93. Plaintiffs are entitled to exemplary and punitive damages for Defendants' fraudulent conduct in the sum to be determined at trial. Further, fraudulent concealment avoids the contract.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### EIGHTH CAUSE OF ACTION

### Unfair and Deceptive Acts and Practices – HRS sec 480-2
### (Against All Defendants)

94. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

95. Plaintiffs are consumers within the meaning of Chapter 480, Hawaii Revised Statutes.

96. Plaintiffs are specifically in the class of persons that this law was designed to protect.

97. Defendants failed to undergo a diligent underwriting process for this loan. They also failed to properly adjust and disclose facts and circumstances relating to Plaintiffs' mortgage loan and placed Plaintiffs in a loan, by way of stated income and misleading facts, which they should never have been approved for because the Plaintiffs could not afford it.

98. Defendants did have knowledge of these facts, circumstances and risks, but failed to disclose them. Defendants also used various rates and charges to disguise the actual payment schedule and loaned amount. The Defendants enjoyed unjust enrichment and have profited and deceptively preyed upon Plaintiffs and their naïve nature in the industry.

99. By reason of Defendants' fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, the

Defendants have engaged in deceptive acts and practices and unfair methods of competition in the conduct of trade and/or commerce actionable under HRS Sec.480-2 and 480-13 that were designed to deprive Plaintiffs of their home, equity, as well as their past and future investment.

100. By reason of the foregoing, Plaintiffs have suffered and continue to suffer damages in a sum which is, as yet unascertained.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### NINTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against Defendants)

101. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

102. Defendants owed a fiduciary duty to Plaintiffs and breached that duty by failing to advise or notify Plaintiffs when Defendants' broker knew, or should have known, that Plaintiffs would, or had a likelihood of, defaulting on the loan. Defendants have a fiduciary duty to the borrower to not place them in that loan (in harm's way).

103. Each of the Defendants has abandoned their Fiduciary Responsibility to Plaintiffs. Aiding and abetting occurred by Defendants offering a stated income loan program to Plaintiffs, then falsifying a loan application to get the Plaintiffs approved for the loan most beneficial to the Defendants.

104. Regarding this loan, it was in the best interest of the Defendants to promote the particular program for which they approved the Plaintiffs. It led to a maximization of profits for the Defendants, with no concern for the borrower. A 30-year fixed rate loan would have netted less return for the lender, though better for the borrower.

105.  Defendants  failed  to  provide  material  disclosures regarding the loan and its interest rate to Plaintiffs while in the capacity of Plaintiffs' lender and qualified Plaintiffs for a  loan  program  that  Plaintiffs  could  not  afford,  while simultaneously allowing a heightened interest rate to benefit the Defendants. The value that Defendants would seek under the loan far exceeds the worth of the Subject Property, as well as what  the  Plaintiffs'  expected.  This  was  intentionally perpetrated by the Defendants.

106.  The  purpose  of  entering  into  the  above-described mortgage loan transactions was for Plaintiffs to eventually own the  Subject  Property.  That  purpose  was  knowingly  and intentionally  thwarted,  and  indeed  made  impossible  by Defendants' actions alleged herein.

107. Plaintiffs are informed, believe and therefore allege that Defendants breached their fiduciary duty to Plaintiffs because they knew, or should have known, that the Plaintiffs would or had a strong likelihood of defaulting on this loan.

108. Defendants  failed  to  fully  comply  with  TILA regulations and laws designated to protect the Plaintiffs. The failure to do so placed Plaintiffs in a serious disadvantage and the potential loss of their home.  Such actions are violations of a fiduciary responsibility owed to Plaintiffs by Defendants.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### TENTH CAUSE OF ACTION
#### Unconscionability – UCC-2-302
#### (Against All Defendants)

109. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

110. If the court, as a matter of law, finds the contract or any clause of the contract to have been unconscionable at the

time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

111. When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

112. Here, based on the deception, unfair bargaining position, lack of adherence to the regulations, civil codes and federal standards that the Defendants were required to follow; coupled with the windfall that the Defendants reaped financially from their predatory practices upon Plaintiffs, the court may find that the loan agreement and trust deed are unconscionable and of no force or effect.

WHEREFORE, Plaintiffs pray for restitution and relief as set forth below.

### ELEVENTH CAUSE OF ACTION
#### Predatory Lending
#### (Against All Defendants)

113. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

114. Plaintiffs are informed, believe and therefore allege that as a result of the practices of Defendants, and each of them, throughout the handling of this loan, that such practices are consistent with the definition of predatory lending, and encompass numerous characteristics of such.

115. The Office of Comptroller of the Currency defines Predatory Lending as any lien secured by real estate which

shares well known common characteristics that result in Unfair and Deceptive Business Practices under the Act.

116. Acts undertaken by the Defendants here that are consistent with the Office of the Comptroller's definition include the fact that this loan was marketed in a way which fails to fully disclose all material terms and includes terms and provisions which are unfair, fraudulent or unconscionable.

117. This loan is marketed in whole or in part on the basis of fraud, exaggeration, misrepresentation or the concealment of a material fact and was underwritten without due diligence by the party originating the loan.

118. This loan does not plainly and prominently disclose the ARP or finance charges of the loan, nor any profit margins that the Defendants stood to receive based upon the unfair terms of the loan, in whole or in part, to a mortgage loan officer.

119. This loan contains loan terms whereby the borrower can never realistically repay the loan, representative of "Bait and Switch" tactics.

120. This loan lends and refinances whereby equity is removed from the home through repeated refinances, consolidation of short term debt into long term debt or interest only loans whereby payments are not reducing principal, high fees and interest rates.  Eventually, borrower cannot refinance due to lack of equity.  This results in equity stripping.

121. This loan is based on a loan application that is inappropriate for the borrowers. For instance, the use of a No Income stated on the loan application from an employed individual who has or can obtain pay stubs, W-2 forms and tax returns.

122. This loan is underwritten without due diligence by the party originating the loan.  There has been no realistic means test for determining the ability of the borrowers to repay the

loan.   Further, there is a lack of documentation of income or assets and/or job verification.

123. The loan is non-amortizing, meaning that the payments are interest only so that the principal balance is never reduced before this loan balance is recalculated and amortized (P+I) over 20 remaining years of the loan.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## TWELVETH CAUSE OF ACTION

### Improper Restrictions As a Result of Securitization
### (Against All Defendants)

124.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

125. The Mortgage is a security agreement between the creditor and debtor to secure repayment of the loan by encumbering collateral for the benefit of the creditor. The security agreement may not be modified or amended by one party without the prior written consent of the other.

126. The Servicing and Pooling Agreement ("Pooling Agreement"), which is the organic document creating Mortgage backed securities with DBC TRUSTEE as Trustee and ONEWEST as servicer, changes the terms and conditions of the Plaintiffs' Mortgage. The changes are made unilaterally by a transferee holder of the Mortgage as a successor in interest to INDYMAC/ONEWEST named in the Mortgage.

127. The transferee holder creates the Pooling Agreement, organizes the securitization by issuing securities ("asset-backed certificates") collateralized by the mortgage pool under the Pooling and Servicing Agreement and appoints the parties to manage the securitization and control this mortgage pool. The Pooling Agreement imposes additional rules and restrictions upon the Mortgage and Note. These changes as well as others are

made without the consent and usually without the knowledge of the Plaintiffs as mortgagors.

128. When the Plaintiffs executed the Mortgage, as mortgagor, they were neither obligated to agree to an alternate dispute resolution in the event of a default nor restricted from entering into an alternate dispute resolution.  When signing the Mortgage, the Plaintiffs as mortgagors neither knew nor had reason to know that a successor in interest to INDYMAC/ONEWEST would subsequently impair transferability of the Mortgage Note or impose new rules and restrictions upon modification of the Mortgage.  Failure to abide by the rules and restrictions imposes liability upon the parties who organized, manage and control the securitization.

129. The Pooling Agreement creates restrictions upon modification of the promissory Note by:

        (a) Imposing the restrictions to modification required to avoid double taxation and make collection of the payments by the trust and payment to the investors a single pass through taxable event, under REMIC, instead of double taxation where the trust and the investors are each taxed for interest income earned.

        (b) Imposing restrictions upon the number of Mortgages in the pool which may be modified.

        (c) Providing a procedure for foreclosure but no procedure to modify the loan as an alternate dispute resolution.

        (d) Creating securities with classes of ownership ("tranches") with adverse and opposing financial interests resulting in so called "tranche warfare" so that a modification which favors one tranche may

work a detriment upon another thereby creating
liability for the managing parties.

(e) Restricting the ability to lower interest payments
on the Note.

(f) Restricting the ability to increase the number of
payments to be made.

(g) Restricting the ability to defer payments.

(h) Restricting the ability to extend the term of the
Mortgage.

(i) Restricting the ability to impose a temporary
moratorium on payments.

(j) Restricting the ability to accept "short sales" or
reduce the principal amount of the debt.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRTEENETH CAUSE OF ACTION
### Wrongful Conversion of Note
### (Against All Defendants)

130. Plaintiffs re-allege and incorporate by reference all
preceding paragraphs as though fully set forth herein.

131. The securitization is a conversion of the Mortgage
rendering it null, void and unenforceable. The Mortgage Note
when executed could be sold or otherwise transferred, in whole
or in part.  The consent given by the Plaintiffs as mortgagors
and the legal authority as holder to enable the holder to sell
or otherwise transfer the Mortgage does not entail the right to
convert the Mortgage into a security. The failure to adhere to
this distinction has resulted in the widespread conversion from
enforceable Mortgages into unenforceable securitized Mortgages.
When the Mortgage was securitized, the Mortgage Note was
converted and could no longer be sold or transferred, in whole
or in part.

132. The parties who manage the securitization such as Defendants DBC TRUSTEE as Trustee and ONEWEST as servicing agent of a pass through trust have no legal or equitable interest in the securitized Mortgage.

133. The securitization divides those who are at a financial risk of loss from a default upon the Mortgage (the investors or certificate holders) from those who control and have decision-making authority over the Mortgage. When the managers decide to foreclose, it is the certificate holders who bear the loss. However, the certificate holders have nothing to say about if, when and how the managers decide to foreclose.

134. The certificate holders, guarantors and Trust insurers bear the losses. Foreclosure avoids litigation from disgruntled certificate holders who could claim a Mortgage modification improperly resulted in a financial loss. By separating the incidence of loss from the authority to foreclose, the original Note has been altered resulting in a change to the Mortgage without the consent of the mortgagor.

135. The conversion of the Mortgage to Mortgage backed securities renders the Mortgage unenforceable. Securitization improperly attempts to divide the Note from the Mortgage and to make the Note a separately enforceable interest. A Mortgage cannot be enforced as a separate interest in the property to be foreclosed apart from and independent of the Note.

WHEREFORE, Plaintiffs pray for relief as set forth below

### FOURTEENETH CAUSE OF ACTION

**The Note And Mortgage Are Unenforceable Because The Mortgagor Never Consented To The Securitization.**

**(Against All Defendants)**

136.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

137. Securitization separates control over the mortgage and the decision to foreclose from the note holder and wrongfully delegates these responsibilities to a group of third party managers.

138. The Plaintiffs as mortgagors was neither informed of nor asked to consent to securitization of the mortgage. Such consent is required. Control of the mortgage is conveyed to a group of managers who adopt a new set of rules to the terms and conditions of the mortgage. The group of managers does not control the mortgage on behalf of an extant note holder.

139. The interest of the Plaintiffs as mortgagor is adversely and materially affected by these changes.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FIFTEENTH CAUSE OF ACTION

**The Restrictions Imposed upon the Modification of the Mortgage are a Clog upon the Equity of Redemption.**

**(Defendants Claiming Any Interest in the Subject Property)**

140. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

141. The equity of redemption creates a right in every mortgagor to redeem the property, i.e., to pay off the debt and remove the lien encumbrance from the property.

142. By restricting the ability to modify the mortgage, securitization interferes with Plaintiffs' rights to redeem the subject property. For example, if the debtor could only afford to pay off 99% of the amount owed, the creditor is barred from accepting the one percent reduction in the payoff. This is a clog on the equity of redemption.

WHEREFORE, Plaintiffs pray for relief as set forth below

## SIXTEENTH CAUSE OF ACTION

### Quiet Title

### (Defendants Claiming Any Interest in the Subject Property)

143. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

144. Plaintiffs are at all times herein mentioned the owners and/or entitled to possession of the Property and a clear title to same.

145. Plaintiffs are informed, believe and thereupon allege that Defendants, and each of them, claim an interest in the Subject Property adverse to Plaintiffs. However, as a result of the conduct more fully described in the preceding allegations, the claim of Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in the Property.

146. Plaintiffs therefore seek a declaration that the title to the Subject Property is vested in Plaintiffs alone and that the Defendants herein, and each of them, be declared to have no estate, right, title or interest in the Subject Property and that said Defendants, and each of them, be forever enjoined from asserting any estate, right, title or interest in the Subject Property adverse to Plaintiffs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTEENTH CAUSE OF ACTION

### The Unenforceability of the Note and Mortgage Requires the Court to declare a Constructive Trust or Mortgage Trust

### (Defendants Claiming Any Interest in the Subject Property)

147. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

148. The Plaintiffs have argued that the mortgage and mortgage note have been rendered unenforceable. Plaintiffs have never claimed the underlying debt does not exist and should not be repaid. Having to rule on this action, a court may incorrectly conclude that by this action the debtor seeks release from the repayment of the debt and create an unearned, invidious windfall for the debtor at the expense from the creditor. This is not the case. Nothing in this action denies the validity of the underlying debt. Instead, this action is about the unauthorized interference between the traditional debtor and creditor relationship by a group of interlopers.

149. These additional parties have securitized the mortgage debt in an improper way which interferes with the rights of the Plaintiffs as mortgagor. In so doing, they have trampled the rights of the debtor, extinguished the status of note holder and severed the traditional connection between the party who is owed the money and the part who is obligated to pay. Securitization has precipitated a breach of contract resulting from a unilateral, unauthorized modification of the original contract between debtor and creditor. It has imposed restrictions upon modification of the loan in the event of a default without the consent of the mortgagor. The securitization has clogged the equity of redemption. It has made the note which was once transferable inalienable.

150. The doctrine of constructive trusts is a recognized tool of equity designed in certain situations to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction.

151. Even if the note and mortgage are legally unenforceable, the court may declare a constructive trust. The court can declare a constructive trust and assure payment to

the trust and certificate holders. As a constructive trust, the court may impose conditions. For example:

    (a)   Review foreclosure fees and charges.

    (b)   Consider compliance with consumer protection laws and avoidance of consumer fraud. Where damages have been suffered by the debtor, the court may allow a set-off.

    (c)   The Court may order mandatory mediation or arbitration.

    (d)   The court may consider a wide range of modifications to the note to allow an alternate dispute resolution.

WHEREFORE, Plaintiffs pray for relief as set forth below.


## PRAYER FOR RELIEF


WHEREFORE Plaintiffs, for the causes set forth herein, ask for the following for each Cause of Action sustained:

    (a)   Immediately take jurisdiction of this matter;

    (b)   Declare that any sale of the property to enforce the mortgage is improper, in that the Defendant lacks legal standing to enforce the terms of the Note and Mortgage or maintain a foreclosure action of the subject premises;

    (c)   Declare that the property is in a constructive trust and that the court can: (i) review foreclosure fees; (ii) consider the compliance by the Defendants with consumer protection laws and allow set-off for any allowable damages; (iii) order mandatory mediation, arbitration or alternative dispute resolution;

(d)   Enjoin Defendant ONEWEST and/or DBC TRUSTEE from transferring and all persons acting in concert or participating with them, from selling, attempting to sell, or causing to be sold the Property, either under the power of sale in the mortgage or by judicial foreclosure action or encumbering the subject property until further order of the court;

(e)   Enjoin the Defendant ONEWEST and DBC TRUSTEE from proceeding with any further collection activity and/or foreclosure activity regarding the subject property until further order of the court;

(f)   Declare the rescission of the Mortgage Loan on account of unfair and deceptive acts and practices by the Defendants, fraud, unconscionability, breaches of fiduciary duties and/or breaches of implied covenants of good faith and fair dealing by all of the Defendants, and to determine the terms of restitution there from;

(g)   Order Defendant ONEWEST and DBC TRUSTEE to provide proof of its authority to foreclose on the subject premises by providing a true and complete original Note properly endorsed to Defendant ONEWEST and/or DBC TRUSTEE .

(h)   Determine that the Plaintiffs are the prevailing party in this action.

(i)   Award the Plaintiffs their actual damages and costs as well as treble damages and/or punitive damages pursuant to and to the extent allowable by law in an amount to be proven at trial, including attorneys' fees and costs, as found to be appropriate upon the trial herein.

(j)   Award Plaintiffs such other and further relief as the Court deems just and equitable.

DATED:   Hilo, Hawaii this _____ day of June 2010.


_____
PAUL J. SULLA
Attorney for Plaintiffs

W. AUGUSTUZ ELLIOTT and
KYOKO ELLIOTT